# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 13-441

**AUTA B. HIGHSMITH, ET UX**

**VERSUS**

**LYNN EDWARD FORET, M.D.**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 20102721
HONORABLE WILFORD D. CARTER, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## JOHN D. SAUNDERS
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of John D. Saunders, Jimmie C. Peters, and John E. Conery, Judges.

AFFIRMED.

**Conery, J., dissents and assigns written reasons.**

**John L. Hammons**
**Nelson & Hammons**
**705 Milam Street**
**Shreveport, LA 71101**
**(318) 227-2401**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
**Auta B. Highsmith**
**Eunice Highsmith**

**J.Gregory Bergstedt**
**Fraiser, Wheeler & Bergstedt**
**P. O. Box 4886**
**Lake Charles, LA 70606-4886**
**(337) 478-8595**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Lynn Edward Foret, M.D.**

**SAUNDERS, Judge.**

This is a medical malpractice case wherein the medial review panel and the trial court found no breach of the standard of care by an orthopedic surgeon who attempted to repair a right low intertrochanteric fracture on one of the plaintiffs. The surgery was unsuccessful and resulted in a non-union of the fracture, a known complication with this type of surgery.

The plaintiffs, due to only documentary evidence being submitted for the trial court to evaluate, contend that a de novo standard of review is applicable to this matter. We find no basis for this assertion and also find sufficient evidence in the record to support the trial court's judgment.

**FACTS AND PROCEDURAL HISTORY:**

On April 3, 2007, Auta Highsmith (Mr. Highsmith) fell in his yard and fractured his right upper femur/hip. He was transported to Lake Charles Memorial Hospital for evaluation. A diagnosis of hip fracture was made at that time. There was no orthopedic surgeon on call at Lake Charles Memorial, so Mr. Highsmith was transported to Christus St. Patrick Hospital in Lake Charles. There, after appropriate pre-operative confirmation of the original diagnosis, on April 5, 2007, Dr. Lynn E. Foret (Dr. Foret) performed the surgical repair of Mr. Highsmith's fracture with an open reduction and internal fixation with a trochanteric fixation nail. Dr. Foret described the procedure as uneventful, and the post-operative radiographic studies that were conducted indicted proper alignment.

On April 12, 2007, Mr. Highsmith was discharged from the surgery floor and admitted to the rehabilitation unit on the same campus. Dr. Foret prescribed physical therapy for Mr. Highsmith to include weight bearing as tolerated. Thereafter, on April 14, 2007, Dr. Foret was re-consulted wherein he

acknowledged that there was motion in the distal femur. He planned to use a L'Nard boot due to the amount of rotation.

According to Mr. Highsmith, he continued to have complications from the surgery such as pain and motion at the fracture site. Following his discharge from the rehabilitation unit, Mr. Highsmith was seen by Dr. Foret several times in May and June of 2007.

Mr. Highsmith relocated to Nevada in the summer of 2007. There, on August 14, 2007, he saw Dr. Michael Ravitch, an orthopedic surgeon. Dr. Ravitch noted that Mr. Highsmith had pain and a limp along with leg numbness, stiffness, and weakness. Radiographic studies done then indicated a non-union of the fracture.

Dr. Ravitch referred Mr. Highsmith to Dr. Roger Fontes, another orthopedic surgeon who specialized in fracture and non-union care. Dr. Fontes described the fracture as a mal-oriented proximal fracture for which he attempted a surgical intervention known as an osteotomy. This procedure failed to stabilize the fracture site. Dr. Fontes suggested a different, more complex surgery, but Mr. Highsmith's cardiologist concluded that he was not sufficiently stable from a cardiovascular standpoint to undergo the surgery. Therefore, Mr. Highsmith has a permanent non-union of the fracture site.

Mr. Highsmith and his wife, Eunice Highsmith (the Highsmiths) timely submitted their claims against Dr. Foret to a medical review panel. The panel issued an opinion dated February 22, 2010, finding that Dr. Foret had not breached the standard of care in his treatment of Mr. Highsmith. Thereafter, on May 21, 2010, the Highsmiths filed a petition for damages against Dr. Foret.

On April 17, 2012, a bench trial was held on the merits. Both parties agreed to submit evidence to the trial court through documentary evidence alone, without

2

any live testimony being taken. The trial court, after taking the case under advisement, found that the Highsmiths failed to prove by a preponderance of the evidence that Dr. Foret breached the applicable standard of care. Judgment was rendered in Dr. Foret's favor dismissing the Highsmiths' claims. The Highsmiths appeal this judgment raising four specifications of error.

## SPECIFICATIONS OF ERROR:

I.  The Trial Court erroneously failed to even consider the expert testimony of Dr. Roger Fontes, the only **treating** physician to provide expert testimony in this matter.

II.  The Trial Court failed to take into consideration the testimony of Dr. Gordon Mead, a member of the medical review panel, who provided deposition testimony confirming that the medical review panel failed to address certain critically important issues and concluded that Dr. Foret deviated from applicable medical standards resulting in the damage suffered by Mr. Highsmith.

III.  The Trial Court erred in reaching three conclusions for which there was absolutely no evidentiary support from any medical expert:

A.  Full weight bearing on an unstable fracture is the standard of care;

B.  A lateral view of the fracture site post-operatively would not have caused the complication to "cease"; and,

C.  Mr. Highsmith's injuries would have occurred anyway because of his age.

IV.  The Trial Court erroneously relied upon the medical review panel opinion even though the only panelist to testify, Dr. Gordon Mead, confirmed that the panel was incorrect because it failed to consider significant issues regarding Dr. Foret's medical mismanagement.

## DISCUSSION OF THE MERITS:

In each of their four specifications of error, the Highsmiths present arguments that all seek the same result, that this court reverse the trial court's finding that they failed to prove, by a preponderance of the evidence, that Dr.

3

Foret's degree of care in treating Mr. Highsmith was substandard. Specifically, each specification of error is an argument that Dr. Foret's care was substandard in either his failure to obtain a radiographic study with a lateral view of the reduction intraoperatively or in his instructions that Mr. Highsmith undergo weight bearing physical therapy. We will address each specification of error under this common heading, as the sole issue before us is whether the trial court was erroneous in its finding the Highsmiths' failed to prove a breach of the applicable standard of care by Dr. Foret.

*STANDARD OF REVIEW*:

The Highsmiths contended both in brief and at oral arguments that the applicable standard of review is de novo in determining whether the trial court's judgment was erroneous. They base this contention on the fact that all evidence submitted at trial was documentary, with no witness testifying live in the presence of the trial court. This court requested additional briefs specifically addressing this issue at oral arguments. After having reviewed the arguments made and said briefs, we find that the Highsmiths' contention is without merit.

Our supreme court, in *Virgil v. American Guarantee and Liability Insurance Co.*, 507 So.2d 825, 826 (La.1987) (quoting *Canter v. Koehring Co.*, 283 So.2d 716, 724 (La.1973) (emphasis in *Virgil*), stated:

> The manifest error standard and its purpose were stated succinctly in *Canter v. Koehring Co.*, 283 So.2d 716 (La.1973), as follows:
>
> > "When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not

4

be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. *The reason for this well-settled principle of review is based* not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also *upon the proper allocation of trial and appellate functions between the respective courts.*" (emphasis supplied)

Louisiana's three-tiered court system allocates the fact finding function to the trial courts. Because of that allocation of function (as well as the trial court's normal procedure of evaluating live witnesses), great deference is accorded to the trial court's factual findings, both express and implicit, and reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on appellate review of the trial court's judgment.

Our supreme court reiterated its view of "the proper allocation of trial and appellate functions between the respective courts" in *Shephard ex.rel Shephard v. Scheeler*, 96-1690, 96-1720, pp. 14-15 (La. 10/21/97), 701 So.2d 1308, 1316-17 (footnotes omitted) when it opined:

The manifest error standard of review is well established and recognized in our jurisprudence. The rigid and strenuous application of manifest error review has served the judicial process well. A lesser standard, albeit when a case is submitted to the trial court solely upon a written record, unduly undermines the allocation of the fact finding function to the trial courts.

We recognize that a good and persuasive argument can be made to lessen the standard of review when evaluations and findings of fact are not based upon demeanor evidence. A review of the jurisprudence of our sister states who have addressed this issue reveals that the majority of states have held that great deference need not be extended to the trial court when its findings of fact are based on depositions, affidavits, and other documentary evidence. Nevertheless, a minority of states adhere to the rule that even when considering documentary evidence, an appellate court must find clear error to overrule the trial court's findings of fact.

After carefully studying this issue, we find that the proper allocation of trial and appellate functions between the respective courts are better served by the heightened standard of manifest error review. Therefore we use this occasion to reaffirm our pronouncement in *Virgil*.

It is clear that our supreme court has instructed that we are to apply the manifest error standard of review to factual findings made by the trial court, regardless of the absence of live testimony, in order to perform our proper function in Louisiana's established court system. While the Highsmiths cited cases that were contrary to our supreme court's mandate, those cases were either: (1) from a circuit different than this one (and based on cases that occurred prior to the clear instructions from our superior court) and, thus, not controlling; or (2) cases that occurred prior to our supreme court's holding in *Virgil*, and, therefore, no longer good law. Accordingly, we will apply the manifest error standard of review where appropriate in this matter despite the lack of live testimony presented to the trial court.

*BURDEN OF PROOF*:

Louisiana Revised Statutes 9:2794 establishes that a plaintiff in a medical malpractice action has the burden to prove, by a preponderance of the evidence, the following:

> (1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.
>
> (2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
>
> (3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

Given the applicable statute, the Highsmiths had the burden to establish the standard of care required of Dr. Foret, to prove that Dr. Foret failed to meet that established standard of care, and to prove that the injuries suffered by the Highsmiths was causally connected to Dr. Foret's failure to meet the established standard of care. The trial court found that the Highsmiths did not prove by a preponderance of the evidence that Dr. Foret's degree of care was substandard. Therefore, we must determine whether the record contains a reasonable basis for the trial court to reach this conclusion.

The following evidence was submitted to the trial court: Mr. Highsmith's medical records, including radiographic imaging, and medical bills; the deposition testimony of Dr. Gordon Mead (an orthopedist and member of the medical review panel); the narrative report of Dr. Roger Fontes (an orthopedist that treated Mr. Highsmith months after the surgery performed by Dr. Foret); the narrative report of Dr. William Overdyke (an orthopedist who performed a review of Mr. Highsmith's records and was an expert hired by the Highsmiths); and the opinion of the medical review panel.

*LATERAL X-RAY*:

The Trial court found that the Highsmiths failed to prove a breach of the standard of care by Dr. Foret based on the findings of the medical review panel. The medical review panel opinion stated:

> The evidence supports the conclusion that the defendant, Dr. Lynn E. Foret, did adhere to the appropriate standard of care as detailed herein, and the damages complained of by [the Highsmiths] were not caused by the negligent [sic] or failure to adhere to appropriate standards of care by [Dr. Foret].

The opinion of the medical review panel went on to address the use of a distal screw to lock intramedullary devices in place. Dr. Foret elected not to use a distal screw in Mr. Highsmith's surgery. In the opinion, the panel asserted that

7

there is no consensus that the failure to lock intramedullary devices is below the standard of care.

Next, the medical review panel found that Dr. Foret's post-operative follow-up was appropriately done with serial radiographic studies, and there was discussion about the necessity of re-operation because of non-union. Finally, the panel asserted that non-union is a known complication of this surgery and that it was not caused by the neglect or failure to adhere to the appropriate standard of care by Dr. Foret.

The Highsmiths contend that the trial court gave far too much credence to the medical review panel's opinion. They contend that the trial court failed to take into consideration the testimony of Dr. Mead which undermined the value of the medical review panel's opinion.

The Highsmiths pointed to portions of Dr. Mead's testimony in an attempt to bolster their contention that the medical review panel failed to address certain critically important issues. They point to Dr. Mead's testimony wherein he stated that he would always obtain and look at radiographic studies of the fractured segments, laterally, to ensure proper alignment intraoperatively and that failure to do so is beneath the standard of care.

In reviewing Dr. Mead's testimony, we do find that Dr. Mead testified to such and further stated that there is no evidence that Dr. Foret actually obtained these lateral views. Unfortunately for the Highsmiths, there is also no evidence that Dr. Foret failed to order and observe such lateral radiographic studies during the surgery and that he merely failed to make those studies part of the permanent medical records. There is evidence in the record that this does occur at times in surgeries such as Mr. Highsmith's in the form of the following testimony of Dr. Mead:

8

A    I would always get an AP and lateral view in the operating room, okay?  I would like to tell you I probably do 98 percent of the time, but there are times when whatever happens and I don't get that documentation and then I don't get it in the recovery room.  Or I think I did it - - I thought the technician got those permanents and it turns out they didn't."

Q    In other words, they took the shot but they didn't make a permanent picture.

A    I saw it, but there was not a permanent evidence of that.

It was the Highsmiths' burden to prove that Dr. Foret neglected to view these radiographic studies, and there is no evidence in the record that Dr. Foret was ever asked whether he viewed any lateral radiographic studies during the surgery. We cannot say that the lack of any lateral radiographic studies performed intraoperatively in the medical records necessitates a finding that Dr. Foret failed to do so.

Insofar as the Highsmiths contend that Dr. Mead's view was different than his view expressed as a member of the medical review panel, we find no evidence that this is accurate.  Dr. Mead stated in his written opinion, the following:

[I]t is impossible to tell whether the fracture was actually poorly reduced and fixed by Dr. Foret or whether the fracture had simply became more angulated over a period of time. . . . I, therefore, find insufficient evidence to make an opinion regarding Dr. Foret's handling of this case.

This statement by Dr. Mead is important as it is directly conflicts with the narrative report of Dr. Fontes that is relied upon by the Highsmiths.  The Highsmiths point out that according to Dr. Fontes, the lack of an adequate reduction or the lack of maintaining the reduction during the instrumentation portion of the surgery resulted in mal position of Mr. Highsmith's fracture which was the major factor that contributed to his failed union.

Dr. Fontes' statement that the lack of reduction contributed to the non-union may be accurate.  However, as pointed out by Dr. Mead, it is not possible to

determine with a reasonable degree of medical certainty whether Mr. Highsmith's lack of reduction was due to substandard treatment by Dr. Foret or due to another factor, time.

The Highsmiths argue that Dr. Fontes' opinion should be afforded greater weight, as he is a treating physician. However, Mr. Highsmith did not see Dr. Fontes until approximately four months after his surgery, and this amount of time, according to Dr. Mead, is enough for such an improper reduction to occur. Further, the radiographic studies that were done postoperatively indicated no such improper reduction, although no lateral radiographic study is indicated to have transpired. Accordingly, Dr. Fontes' status as a "treating physician" in order for his testimony to be given greater weight has minimal relevance. Given that the Highsmiths have the burden to prove that this lack of reduction was caused by Dr. Foret's inadequate surgery, one cannot say that a finding that they failed to carry this burden is unreasonable. As such, we uphold the trial court's finding that the Highsmiths failed to prove that Dr. Foret's failed to obtain and view a lateral radiographic study of Mr. Highsmith's fracture intraoperatively to ensure proper reduction.

We note that Dr. Mead did testify that were he in Dr. Foret's position in this litigation, he would have included some evidence, at least testimonially, that he intraoperatively observed a lateral radiographic study of Mr. Highsmith's fracture. Dr. Foret's submission did not include any such indication. While this court has sympathy for the Highsmiths on this issue, we are bound by our supreme court's directive to give deference to the trial court's reasonable finding of fact coupled with the burden of proof placed upon the Highsmiths.

10

*PHYSICAL THERAPY*:

The Highsmiths also argue that Dr. Foret's inclusion of full weight bearing in his prescribed physical therapy was a breach of the standard of care, and the trial court's failure to make this finding was in error. We disagree.

Our review of Mr. Highsmith's medical records indicates that Dr. Foret ordered full weight bearing *as tolerated*. This is not a command by Dr. Foret that the therapist is to force Mr. Highsmith to endure full weight bearing no matter the circumstances. Thus, the Highsmiths contention that Dr. Foret ordered full weight bearing, and leaving off the key phrase, "as tolerated," is quite significant.

When discussing the issue of ordering full weight bearing, as tolerated, in Dr. Mead's deposition, the following exchange transpired:

Q:     One of the biggest issues that has come up is the case concerns instructions concerning weight bearing. Did the panel review this issue?

A:     Yes.

Q:     And what is the general feeling on this patient – an eighty-one year old patent with the nature and extent of the injury that he had, with the surgery that he had, the hardware he had, concerning that portion of rehabilitation?

A:     Okay. As far as I'm concerned, an eighty-one year old person is not going to be non-weight bearing on the broken hip. Okay? You have to rely on the fixation. They would have to stay in bed for six months or three months or whatever. If they're going to get out of bed, they're going to do some weight bearing on that leg. If they're going to sit up, they actually - there are forces across that hip. So you can't get away from stressing it. So my - *I almost universally allow patients to weight bear as tolerated*. That's not entirely - that's not a hundred percent. There are cases where I feel that there's too much risk, and if the patient can't mentally cooperate sufficiently, I'm going to keep them as minimally weight bearing as possible because I'm just worried that my fixation is not going to hold well enough.

While the Highsmiths submitted the contrary opinion of Dr. Overdyke wherein he disagreed with Dr. Mead, our function is not to replace the choice of

11

the trial court to give credence to one expert over another. Rather, we are to ensure that the choice of the trial court is reasonable. Here, Dr. Mead's testimony provides a reasonable basis for the trial court to find that full weight bearing as tolerated is the instruction generally given by orthopedists to therapists treating patients such as Mr. Highsmith. Therefore, we cannot say that the trial court was manifestly erroneous in finding that the Highsmiths failed to prove that Dr. Foret breached the standard of care in his prescribing full weight bearing as tolerated for postsurgical physical therapy.

*OTHER ARGUMENTS RAISED BY THE HIGHSMITHS*:

In brief, the Highsmiths make various arguments regarding statements made by the trial court in its reasons for judgment that they characterize as erroneous and entitling them to a reversal of the trial court's judgment. It is well settled that reasons for judgment are not appealable, as an appeal is to address the written, final, appealable judgment. *McFadden v. Import One, Inc.*, 10-952 (La.App. 3 Cir. 2/9/11), 56 So.3d 1212; *LaRocca v. Bailey*, 01-618 (La.App. 3 Cir. 11/7/01), 799 So.2d 1263; La.Code Civ.P. art. 1918. Here, the trial court's judgment was that the Highsmiths failed to prove that Dr. Foret breached the standard of care. Above, we observe adequate support in the record for the judgment reached by the trial court. As such, we will not address these arguments.

**CONCLUSION:**

Auta and Eunice Highsmith appeal the trial court's judgment that they failed to prove that Dr. Lynn Foret's care of Auta Highsmith was beneath the standard of care. They raise four specifications for error questioning two findings of fact by the trial court.

12

We find a reasonable basis exists in the record for the trial court's findings. Accordingly, we uphold its judgment. We assess all costs of these proceedings to Auta and Eunice Highsmith.

**AFFIRMED.**

COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA

AUTA B. HIGHSMITH, ET UX

VERSUS

LYNN EDWARD FORET, M.D.

**CONERY, J., dissents and assigns written reasons.**

I respectfully dissent. I would reverse the judgment of the trial court, enter judgment for the plaintiffs, and remand for a trial on damages.

*Standard of Review*

In *Virgil v. American Guarantee and Liability Insurance Co.*, 507 So.2d 825 (La.1987), and *Shephard v. Scheeler*, 96-1690 (La. 10/21/97), 701 So.2d 1308, our supreme court has held that even when a case is submitted to the trial judge for decision on record evidence only with no live testimony, we are nonetheless obligated to apply the manifest error standard when reviewing the case on appeal. When reviewing a summary judgment, likewise submitted on only record evidence with no live testimony, we are to use the less restrictive de novo standard. *Smith v. Our Lady of the Lake Hosp., Inc.*, 93-2512 (La. 7/5/94), 639 So.2d 730; *Smitko v. Gulf South Shrimp, Inc.*, 11-2566 (La. 7/2/12), 94 So.3d 750.

How do we reconcile the cases using the manifest error standard of review when reviewing cases submitted for trial on documents, affidavits, and depositions with those cases using the de novo standard when considering summary judgments using the same type of evidence? This seeming inconsistency can be explained by

examining the rationale behind the rulings. A trial on the merits requires the trial judge to find the facts. The proper allocation of trial and appellate court functions requires deference to the fact finder. Summary judgments, on the other hand, can only be granted in cases where the material facts are not in dispute, hence no factual findings and no deference is required.

The larger question under the manifest error standard is how to decide whether the trial court was clearly wrong, how to *apply* the proper allocation of trial and appellate court functions. In *Virgil* and *Shephard*, our supreme court emphasized that even though a trial judge may have decided a case on a "cold record," without live testimony that would allow the fact finder to observe demeanor, inflection, tone, and manner of testifying witnesses, appellate courts should none the less accord *great deference* to "the trial court's factual findings, both express and implicit, and reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on appellate review of the trial court's judgment." *Shephard*, 701 So.2d at 1316. Immediately after this pronouncement of the standard of review in *Shephard*, the supreme court went on to find that the trial court in that case "clearly erred in finding that the accident was caused by an unreasonably dangerous puddle of standing water[.]" *Id*. The court reversed a finding of fact made by the trial court that it found was "clearly erroneous" based on review of all evidence of record. Clearly, *great deference* does not mean *total deference*.

In *Alexandria vs. Pellerin Marble & Granite*, 93-1698, p. 1 (La. 1/14/94), 630 So.2d 706, 710, the supreme court re-affirmed *Virgil* and *Shephard's* holding that the manifest error standard applied, even when documentary evidence is used, but then reversed a portion of the judgment of the hearing officer and appellate

2

court, stating:

> We find that the court of appeal did not err by applying the manifest error standard of review. Application of the manifest error standard of review does not however, mandate the affirmance of a lower court decision with respect to findings of fact. When an appellate court finds manifest error, the factual findings of the trier of fact may be reversed.

*See* also *Magbee v. Federal Exp.*, 12-77 (La.App. 3 Cir. 12/12/12), 105 So.3d 1048, and *Racca v. Acme Truck Lines, Inc.*, 12-1319 (La.App. 3 Cir. 6/12/13), 115 So.3d 1222 (both applying the manifest error standard, but finding that the workers' compensation judge was clearly erroneous). *Great deference* does have its limitations. The appellate court can and must review the facts in fulfilling its purpose, role, and function.

### Analysis of the Evidence

We must now analyze the factual findings made by the trial judge in this case in light of the jurisprudence. First of all, even though we must use the manifest error standard, we do not have to ascribe any weight to the trial court's ruling concerning the credibility of witnesses based on the manner of their testifying, tone, demeanor, or any other like evaluation, since all of the evidence in this case was submitted by affidavit, records, or depositions. Therefore, we need only evaluate the judge's actual factual findings to determine whether those findings were "clearly wrong." What are those findings and are they supported or contradicted by the record evidence in this case?

The trial court based its decision primarily on the findings of the medical review panel. That opinion was primarily directed at whether the failure to use a distal screw to lock a rod used to stabilize Mr. Highsmith's femur fracture in place during surgery was a breach of the standard of care. Dr. Foret did not use a distal

3

locking screw in this case. The medical review panel concluded that the use of a distal locking screw to help prevent movement at the fracture site when performing this type of surgery is the preferred practice but it was not a violation of the standard of care for Dr. Foret not to do so, in their opinion. No facts were put forth to support their conclusion, except to discuss in passing that not all orthopedic surgeons use a distal locking screw.

The real question at issue is whether proper alignment and adequate reduction of the fracture was achieved in this particular surgery. Movement is an indication of possible improper alignment of the bones and inadequate reduction. A distal locking screw was not used to hold the stabilizing rod in place in this case, which is all the more reason to make sure proper alignment and reduction was achieved to prevent movement and foster bone healing. To successfully accomplish this goal for a surgery of this type, the surgeon must use x-rays. The uncontradicted evidence from Dr. Mead, a member of the original medical review panel whose deposition and records were filed in evidence, was that both a frontal (AP) x-ray view and a side (lateral) x-ray view must be visulaized during surgery. The standard of care requires that the surgeon must visualize proper alignment and reduction of the fracture by use of a lateral x-ray before closing. The record in this case *is silent* as to whether a lateral view was taken and visualized by Dr. Foret during Mr. Highsmith's surgery.

The majority relies heavily on the written report of Dr. Mead in concluding plaintiffs failed to prove that Dr. Foret violated the standard of care. The majority quotes from Dr. Mead's report:

> [I]t is impossible to tell whether the fracture was actually poorly reduced and fixed by Dr. Foret or whether the fracture had simply became more angulated over a period of time . . . . I, therefore,

4

find insufficient evidence to make an opinion regarding Dr. Foret's handling of this case.

Dr. Mead's statement, however, fails to properly account for the uncontradicted evidence that the medical records are *silent* on the issue of whether Dr. Foret visualized a lateral view to insure proper alignment and reduction during surgery. He did not "*listen to the sound of silence*," to quote from Simon and Garfunkel's famous song. The trial judge and the majority were likewise "tone deaf" to the "*sound of silence*" in the record on this issue and would place on the plaintiffs the impossible burden of proving a negative.

Dr. Mead, however, did offer the following testimony that is especially pertinent to the issue:

> Q. So, since there is no evidence of a lateral view, would you agree that if Dr. Foret failed to visualize the fracture with a lateral view intraopertively and post operatively that would be below the standard of care?
>
> A. Yes.

Dr. Mead's testimony on this issue is completely uncontradicted and must be accepted as true.

Even though Dr. Mead clearly testified that failure to visualize a lateral x-ray of the fracture during surgery was a violation of the standard of care and there was no evidence that a lateral x-ray was ordered or visualized by Dr. Foret during surgery, he then went on to testify that no evidence means that evidence was lacking as to whether Dr. Foret did or did not visualize a lateral x-ray. He gave the example that sometimes surgeons view the fracture during surgery using a c-arm fluoroscopy or moving x-ray technique. If the surgeon saw proper alignment and reduction at the fracture site while he was operating, then the radiologist need not actually take and develop a standard lateral x-ray film. Dr. Mead did say, however,

5

that he and everyone he knew of did take a lateral x-ray. Basically, his testimony was to the effect that it is possible that Dr. Foret did visualize a lateral view on fluoroscopy. Dr. Mead could not tell from the medical, hospital, and surgical records whether Dr. Foret did so in this particular case, as Dr. Foret made no operative notes of a lateral view of alignment and reduction, nor did not note that he visualized a lateral view during fluoroscopy.

The majority concludes that the plaintiffs did not prove that Dr. Foret failed to look at a lateral view. Since some surgeons arguably do look at fluoroscopy during surgery and do not record that fact in the record, the majority concluded that plaintiffs failed to sustain their burden of proof that Dr. Foret did not look at a lateral view during surgery.

Dr. Mead testified, however, that all pertinent findings during surgery must be recorded in the medical record. The evidence is uncontradicted that in a case like this, a lateral view must be obtained in order to insure proper alignment and reduction of the femur fracture, a very pertinent finding as this is the standard of care. Since the medical record is *silent* as to whether Dr. Foret ordered a lateral view, or that the radiologist did take a lateral view, or that Dr. Foret did visualize the proper alignment and reduction on fluoroscopy before closing the surgery, a prima facie case has been proven that Dr. Foret violated the standard of care.

Dr. Foret did not testify at trial, and his records, as well as the hospital and surgery records, are completely *silent* on that issue. If anything, his failure to testify would ordinarily raise a presumption that his testimony would have been detrimental to him. Since both parties stipulated that only records would be used in this trial with no live testimony, such a legal presumption cannot be applied in this case. We must, therefore, "*listen to the sound of silence.*" No notation means no

6

lateral view was taken or visualized.

The circumstantial evidence in this case is overwhelming. There is no question that Mr. Highsmith had a non-union. Movement at the fracture site was detected by the physical therapist shortly after surgery. Mr. Highsmith continued to complain of severe pain. Yet, Dr. Foret, ignoring the findings and recommendations of the therapist and the complaints of Mr. Highsmith, continued to order full weight bearing on a femur that had not been properly aligned for healing. Dr. Foret did not order a lateral x-ray even after he examined the patient and personally noted movement at the fracture site fourteen days post-surgery. His records and therapy records are clear and uncontradicted. There was undeniable evidence of movement and a failed surgery within days of the surgery, while Mr. Highsmith was still in the hospital and the hospital rehab facility.

The records of Dr. Ravitch and Dr. Fontes, Mr. Highsmith's treating orthopedic surgeons who saw him several months post-surgery, attest that Dr. Foret's surgical and post-surgical care fell below the standard of care. Lateral x-rays taken by them several months after the surgery and reviewed by each of them showed there was a severe angulation noted at the fracture site that could easily have been seen during or shortly after surgery using a lateral x-ray. These treating physicians further testified that Dr. Foret's failure to use a lateral x-ray was malpractice and was the cause of Mr. Highsmith's continuing pain and disability.

Drs. Ravitch and Fontes verified that had a lateral x-ray view been obtained at the time of the surgery, Dr. Foret would have been able to determine that he had set the fractured femur at a severe angle, which eventually caused the broken ends of the bone to rub against each other. The frontal (or AP) x-ray taken would not have shown this poor alignment. According to Mr. Highsmith's treating

7

physicians, Dr. Fontes and Dr. Ravitch, and the plaintiffs' expert, Dr. Overdyke, the non-union caused additional destruction to Mr. Highsmith's bones, as well as soft tissue damages and severe pain. It is uncontradicted that the physical therapist stated in his record shortly after surgery that in his professional judgment, full weight bearing, as ordered by Dr. Foret, was inappropriate due to external rotation of the leg and obvious motion at the fracture site. Even after he personally found on physical exam that there was movement at the fracture site within fourteen days of surgery, Dr. Foret nevertheless continued to order full weight bearing and still did not perform a lateral x-ray. Dr. Foret's orders taken directly from the physical therapy records confirm that Dr. Foret ordered Mr. Highsmith to "push to full weight bearing as soon as possible," not "weight bearing as tolerated."

It was at this point that the therapist pulled Mr. Highsmith's son aside and expressed his opinion that full weight bearing was harmful to Mr. Highsmith and that he should not walk. Mr. Highsmith's daughter then moved her father to Nevada, where Mr. Highsmith consulted Dr. Ravitch and Dr. Fontes.

Dr. Ravitch is a highly credentialed board certified orthopedic surgeon. He noted that in his examination about four months post-surgery that Mr. Highsmith continued to have severe and intractable pain, numbness, stiffness, and weakness in his right leg. Mr. Highsmith had a noticeable limp, and Dr. Ravitch noted that Mr. Highsmith's right leg was one inch shorter and was tender at the fracture site. Lateral x-rays showed a severe and obvious abnormality and non-union.

Dr. Ravitch referred Mr. Highsmith to Dr. Fontes, his partner, an orthopedic surgeon who specialized in treating non-unions. After his evaluation, Dr. Fontes confirmed that Mr. Highsmith was indeed suffering from "a mal-reduction of the proximal femur which was 30 degrees flexed on the lateral view." He stated that

the misalignment can be easily seen and diagnosed by use of a lateral view x-ray. Dr. Fontes agreed with the opinion of Dr. Mead that failure to obtain a lateral view by Dr. Foret would be a violation of the standard of care. Dr. Fontes also agreed with Dr. Ravitch in his conclusion that Dr. Foret had violated the standard of care by failing to visualize a lateral view of the fracture during surgery, and that Dr. Foret's surgery and post-surgery care fell below the standard of care, resulting in the non-union, continuing pain, and the need for treatment. Dr. Fontes attempted further surgical intervention to try to place a distal locking screw in place to help prevent further motion, but due to the severe damage that had been caused by the non-union, the osteotomy procedure he performed was not successful.

According to Dr. Fontes, the only remaining option was a more complex "take down" surgery. Due to Mr. Highsmith's poor health and advanced age of eighty-one years, he could not be cleared for the procedure from a cardiovascular standpoint. According to the medical records introduced, Mr. Highsmith continues to suffer severe pain from a permanent non-union, has a permanent limp, and has a noticeable knot in his thigh.

The trial court failed to consider Dr. Mead's testimony on the critical issue of documenting x-ray findings in the record, and the necessity of visualizing a lateral view and recording that finding in the record. He also failed to consider the testimony of the treating physicians, Dr. Ravitch and, especially Dr. Fontes on this issue. It is well settled that the testimony of a treating physician is entitled to greater weight than that of an examining physician or an expert who reviews records only. *Wilczewski v. Brookshire Grocery Store*, 08-718 (La.App. 3 Cir. 1/28/09), 2 So.3d 1214; *Johnson v. NATCO*, 94-1236 (La.App. 3 Cir. 3/1/95), 651 So.2d 494.

9

Here, the trial judge relied on the opinion of the medical review panel, which addressed only the question of whether a distal locking screw should have been used to prevent movement, not whether a lateral x-ray should have been taken to determine proper alignment and reduction.

Rather, the medical malpractice in this case is best summarized in the report from Dr. William Overdyke, a board certified orthopedist, nationally recognized as a joint replacement specialist. Dr. Overdyke reviewed all of Mr. Highsmith's records and x-rays and concluded that Dr. Foret clearly committed medical malpractice. He stated:

> In my professional opinion, after reviewing the course of treatment and outcome, acceptable medical standard has been breached. Inappropriate use of the internal fixation and in addition, after admitting that there was gross motion at the fracture site, electing not to address the problem but to continually push the patient to weight bear on a fracture that should not be stressed. Again, to make it clear, I believe that the medical care was below an acceptable standard, and I believe that any panel review would agree with the side of the plaintiff.

Dr. Overdyke further opined that even after Dr. Foret became aware of a possible non-union and movement at the fracture site, his post-surgical care continued to be beneath the standard of care. He summarized the medical records in this case:

> The summary of the treatment was that Mr. Highsmith sustained a femur fracture on April 3, 2007. He underwent internal fixation with a TFN internal fixation device placed by Dr. Lynn Foret on 4/5/07. Following the internal fixation, the patient remained in acute care for several days and he was discharged on 4/12 to rehab. On 4/14, it was noticed that there was motion at the fracture site. Even following this information, Dr. Foret continued to try to press to full weight bearing.
>
> On 4/16, the right lower extremity was found to be externally rotated. He was placed in a brace to decrease stress motion. In orders obtained from the chart dated 4/27, a physical therapist wrote in their notes (under St. Patrick page 452) that in their professional judgment, they didn't think it was appropriate to push to full weight bearing. Orders taken verbally in the hospital on 4/24, 26, and 27, say push to full weight bearing as soon as possible. This is in the face of an x-ray that

10

was done on 4/24 that showed apparent complete loss of internal fixation and comminution at the fracture site. An additional note on 4/25, the physical therapist noted that the son was taken aside apparently in private conversation and was told it was not appropriate for the patient to ambulate in light of the x-ray on 4/24. I understand from your inquiry that the patient was moved to Nevada and the non-union was, hopefully, appropriately treated.

The trial judge was "clearly erroneous" and committed "manifest error" in failing to properly weigh and consider the evidence in this case. *Shephard*, 701 So.2d 1308; *Alexandria*, 630 So.2d 706.

### *Conclusion*

In summary, the overwhelming weight of the evidence clearly demonstrates that Dr. Foret's surgery resulted in a non-union at the fracture site, which he neglected to recognize based on his failure to order and review a lateral x-ray during and post-surgery. His post-surgical care, even after he became aware of the non-union and movement at the fracture site, fell below the standard of care. His negligence was clearly the proximate cause of Mr. Highsmith's continued injuries, damages, and disability.

In the interest of justice, this case must be reversed and judgment must be rendered in favor of the plaintiffs.

### *Damages*

The record is sparse on the issue of damages. Mr. and Mrs. Highsmith did not testify. The parties stipulated to the amount of medical bills incurred due to the alleged malpractice. Other than the medical records and bills, there is no other evidence in the record from which this court could perform a de novo review and properly assess damages. I would remand this case to the trial court for proper consideration of the issue of damages consistent with this opinion.

11